**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X          06 CR 0578 (NG)
**UNITED STATES OF AMERICA,**

   **-against-**                                                                   **ORDER**

**DERREK PANNELL,**

                       **Defendant.**
-------------------------------------------------------X

**GERSHON, United States District Judge:**

      Defendant Derrek Pannell moves to suppress post-indictment statements he allegedly made to his cellmate, Everold Miller, while awaiting trial at the Metropolitan Detention Center ("MDC"). Pannell contends that the government procured these statements – through Miller, a "jailhouse informant" – in violation of his Sixth Amendment right to counsel.[1] In response to Pannell's motion, the court held an evidentiary hearing, pursuant to *Massiah v. United States*, 377 U.S. 201 (1964), on August 30, 2007. During the hearing, the government offered Miller's testimony and that of the case agent who interviewed Miller on two separate occasions. Pannell's previous counsel testified for the defense. Based on my findings of fact, and for the reasons stated below, Pannell's motion to suppress is granted in part and denied in part.

## FACTS

      Derek Pannell was arrested on July 26, 2006, for the November 15, 2005 armed robbery of the James E. Davis United States Post Office in Brooklyn, New York. After his arrest, Pannell was

---

[1] In the opening paragraph of his motion papers, Pannell makes passing reference to the Fifth Amendment, summarily stating that his statements were obtained in violation of his right to remain silent. Pannell offers no argument in support of this claim, however, and instead devotes his entire memorandum of law to his Sixth Amendment claim.

1

indicted for the robbery and was housed in the MDC.

In February 2007, Everold Miller, Pannell's former cellmate, contacted Assistant United States Attorney ("AUSA") John Nathanson of the Eastern District of New York and explained that he had information regarding Pannell's participation in the November 15, 2005 armed robbery. Miller was not, at that time, new to government cooperation. Approximately three and a half years ago, Miller pled guilty to drug trafficking and conspiracy charges in the Southern District of Florida and was sentenced to 266 months in prison for his participation in those crimes. Subsequently, Miller entered into a cooperation agreement with the government in which he agreed to provide information about and testify against his co-defendants in the hope of receiving a reduced sentence pursuant to Rule 35 of the Federal Rules of Criminal Procedure. Sometime thereafter, Miller was transferred to the MDC so that he could testify against several of his co-defendants who were being tried in the Eastern District of New York. Miller testified in that case in January 2007. In addition to cooperating in his own criminal case, Miller has, over time, provided information to the government about other, unrelated crimes. In general, Miller has reported to the government any information he has learned that he believed would be helpful to the government.

Shortly after testifying in January 2007, the Bureau of Prisons randomly assigned Miller to a cell with Pannell.[2] The designation was not done with the government's knowledge or involvement. Accordingly, at that time, Miller had not been instructed by the government to ask Pannell about his case or the armed robbery of the post office. Miller did understand, however, from

---

[2] Upon arrival at the MDC, Miller was housed with a different inmate. In February 2007, Miller was separated from this inmate, who allegedly threatened Miller's life after he (the inmate) began to suspect that Miller was cooperating with the government. The Bureau of Prisons then re-assigned Miller to Pannell's housing unit.

2

the day he first entered into his cooperation agreement with the government, that any information he could provide to the government regarding any criminal matter would be to his benefit. Specifically, Miller understood that providing such information could serve as a further basis for Rule 35 relief.

Upon hearing Miller's offer of information, AUSA Nathanson told Miller that he would speak to the AUSA who was handling the Pannell matter. Shortly thereafter, AUSA Nathanson informed AUSA John Durham that Miller had information relating to the armed robbery. On March 6, 2007, AUSA Durham and U.S. Postal Inspector Vincent Minecci – the case agent for this matter – debriefed Miller regarding his knowledge of the armed robbery and Pannell's involvement in it.[3] In sum and substance, Miller stated that Pannell admitted to participating in the armed robbery of the post office and provided certain detailed information. In addition, Miller provided detailed, handwritten notes to the government which he said he took while and after Pannell spoke about his case.[4] At the conclusion of the March 6, 2007 meeting, both AUSA Durham and Postal Inspector Minecci specifically instructed Miller that Pannell was represented by counsel, that he (Miller) should not attempt to discuss the armed robbery of the post office or Pannell's pending case with Pannell, and that he (Miller) should not go through Pannell's belongings. Miller was then returned to his cell at the MDC, where Pannell continued to reside.

In early April 2007, AUSA Durham learned that Miller had additional information relating

---

[3] The March 6, 2007 debriefing will be referred to as the "first meeting."

[4] At the *Massiah* hearing, Miller represented that he had, at times, taken notes while Pannell spoke and, at other times, waited until Pannell finished speaking to memorialize the information. He explained that he would contemporaneously take notes only when Pannell would speak from the bottom bunk. He claimed that, since he was positioned on the top bunk, he was able to write the information down without being seen by Pannell.

3

to the post office robbery. On April 17, 2007, Postal Inspector Minecci met with Miller a second time and debriefed him further regarding the information Miller learned about the robbery of the post office.[5] Miller provided additional incriminating information regarding Pannell. He also submitted detailed, handwritten notes to Postal Inspector Minecci, which Miller represented were taken while and after Pannell spoke about the robbery. When asked how he acquired this information, Miller explained that Pannell volunteered it during the course of their many conversations. Miller told Postal Inspector Minecci that Pannell often brought up his case and that he (Miller) had never elicited any information regarding the robbery. Specifically, Miller told Postal Inspector Minecci that he would converse with Pannell about general matters, like cars or Pannell's family, and that Pannell would ultimately relate those issues to aspects of his case. Miller represented to Postal Inspector Minecci that he never encouraged Pannell to address the robbery or his case in general. At the conclusion of the meeting, Miller was again instructed not to solicit any information from Pannell regarding the pending case.

Sometime after the second meeting, but before August 2007, Postal Inspector Minecci received additional notes from Miller.[6] Those notes, dated April 20, 2007, contain additional incriminating information regarding Pannell. Also in April 2007, Miller was removed from Pannell's cell after Miller complained to MDC staff that Pannell had stolen his legal papers. Among the papers that Miller claimed to have been stolen were the notes Miller had been taking regarding

---

[5] This debriefing will be referred to as the "second meeting." AUSA Durham was not present at the second meeting.

[6] Postal Inspector Minecci does not specifically recall when he received the third set of notes. He does recall, however, that he received them after the second meeting and before August 7, 2007, when he met with AUSA Durham and Miller in preparation for the *Massiah* hearing.

4

Pannell's alleged statements.

At the *Massiah* hearing, the defense suggested, through the cross-examination of Miller, that Miller obtained the information he claims was told to him by Pannell by surreptitiously reading Pannell's legal papers.[7]

**DISCUSSION**

**I.     *Massiah* Analysis**

The government violates a defendant's Sixth Amendment right to counsel when it uses, as evidence, statements made by the defendant "which [it] had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Massiah v. United States*, 377 U.S. 201, 206 (1964). These principles apply with equal force in the jailhouse informant context. *United States v. Henry*, 447 U.S. 264 (1980). To make out a *Massiah* violation, a defendant must show that (i) a government informant (ii) deliberately engaged in elicitation. *Massiah*, 377 U.S. at 206; *see also United States v. Stevens*, 83 F.3d 60, 64 (2d Cir. 1996).

The first inquiry, then, is whether the informant acted as a government agent when he obtained information from the defendant. The Second Circuit has held that an informant becomes

---

[7] As part of his motion, Pannell had filed an affidavit, dated June 28, 2007, in which he states that the information provided by Miller is false. According to the affidavit and contrary to Miller's representations, Miller started asking questions about Pannell's case shortly after he arrived in Pannell's cell; suspicious of Miller's constant questioning, Pannell declined to volunteer information to Miller and informed his then attorney, Frederick H. Cohn, that he believed the government had planted a government informant in his cell. Mr. Cohn expressed doubt regarding Pannell's theory, but nonetheless advised Pannell to be careful and not respond to Miller. During the hearing, Mr. Cohn confirmed that Pannell had expressed concern regarding his cellmate's constant questioning and that he (Mr. Cohn) did dispense the aforementioned advice to his client in early to mid-March of 2007. According to Pannell's affidavit, Pannell followed Mr. Cohn's advice and did not speak about his case with Miller. Since Pannell did not testify at the hearing, his statements that Miller questioned him will not be considered.

5

a government agent "only when the informant has been instructed by the police to get information about the particular defendant." *United States v. Birbal*, 113 F.3d 342, 346 (2d Cir. 1997). Because "[t]he *Massiah* rule covers only those statements obtained as a result of an intentional effort *on the part of the government*[,] . . . information gotten before the inmates became agents/informants is not protected by the rule." *Stevens*, 83 F.3d at 64 (2d Cir. 1996) (emphasis in original).

The second inquiry – whether, once a government agent, the inmate engaged in deliberate elicitation – turns on whether the government agent obtained information by serving as a mere "listening post" or instead participated "in active conversation" and prompted "particular replies" from the defendant. *Kuhlmann v. Wilson*, 477 U.S. 436, 456-59 (1986). To establish deliberate elicitation, therefore, a defendant "must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Id* at 459.

### A. Was Miller a Government Agent?

Two discrete time periods deserve separate attention. First, I will determine whether Miller was a government agent, with regard to Pannell, before he attended the first meeting, on March 6, 2007. Second, I will determine whether Miller became an agent during or after that meeting.

Miller was randomly assigned to a cell with Pannell at the MDC, without the government's knowledge or involvement. Pannell does not contest this fact. Nonetheless, Pannell argues that, because Miller was a government agent with regard to other criminal matters when he arrived at the MDC, he was one with regard to Pannell's case as well. In other words, Pannell argues that Miller's prior agreement with the government rendered him a roving agent. Pannell is incorrect.

Pannell's "roving agent" argument was squarely rejected in *Birbal*, where the Court of

Appeals for the Second Circuit found that an informant becomes a government agent "only when the informant has been instructed by the police to get information about the *particular* defendant." *Id*. at 346 (emphasis added). In that case, the informant – who had recently entered into an agreement with the government to provide "any and all information in his possession" relating to "any and all criminal activities . . . of which he ha[d] knowledge" – actively sought out information from his jailmate, the defendant, in the hopes of securing a benefit from the government in exchange for his testimony. *Id*. at 344. After questioning Birbal, the informant relayed the information he had gathered to the government, which ultimately used Birbal's statements against Birbal at trial. In affirming the admissibility of the informant's testimony, the Court unequivocally rejected the defendant's argument that, because of the informant's previous agreement with the government, the informant was a roving agent: "The Sixth Amendment rights of a talkative inmate are not violated when a jailmate acts in an entrepreneurial way to seek information of potential value, without having been deputized by the government to question that defendant." *Id*. at 346.

The nearly identical facts here demand the same conclusion. The government had no knowledge of or involvement with Miller's placement in Pannell's cell. Once housed with Pannell, Miller, on his own volition, contacted the government and indicated to AUSA Nathanson that he had information regarding Pannell's case. AUSA Nathanson forwarded this information to AUSA Durham, who in turn arranged to meet with Miller. At no time before March 6, 2007, the date of the first meeting, did the government instruct or encourage Miller to obtain information from Pannell. Instead, Miller, an entrepreneurial inmate, obtained information from his cellmate in the hopes of trading that information for a reduction in sentence. Without having been deputized by the government to do so, Miller was not acting as a government agent.

More complicated, however, is the question of whether Miller was a government agent, with regard to Pannell, after attending the first meeting. The government argues that, under *Birbal*'s reasoning, the government must explicitly *instruct* an informant to obtain information from a defendant before the informant is rendered an agent. From this premise, the government concludes that Miller was not an agent when he returned to his and Pannell's cell, as the government did not instruct Miller to elicit additional information from his cellmate. In fact, the government points out, it instructed the opposite: that Miller not question Pannell about his case.

I disagree with both the government's reading of *Birbal* and its conclusion that Miller did not become an agent. First, the *Birbal* court implicitly recognized that the informant there did in fact become a government agent once he reported the defendant's statements to the government. Although the court ultimately permitted use of statements gathered by the informant after his meeting with the government, it did so only because it expressly found that the informant, already a government agent, had not engaged in deliberate elicitation: "As soon as the government became involved, [the informant] stopped asking questions; he simply listened to Birbal's bragging and reported it to the government."[8] *Id*. at 346. Contrary to the government's position, therefore, under *Birbal*, Miller became a government agent, with regard to Pannell, upon cooperating with the government on March 6, 2007. Similar to the informant there, Miller ceased acting as a private individual once "the government became involved" and expressed interest in using Pannell's

---

[8] The court based this statement on the defendant's own testimony at the suppression hearing before the district court: "Both the DEA agent and the officer told [the informant] to ask no more questions, but to listen if Birbal had more to say about his drug activity. [The informant] apparently complied; Birbal confirmed at the suppression hearing that [the informant] asked no further questions during their time in jail. [The informant] learned more about Birbal's drug activity as a result of hearing conversations between Birbal and another inmate, Gary Malley." *Id*. at 344.

statements at trial. *Id*. at 346.

That the government instructed Miller not to question Pannell before Miller, with the government's knowledge, was returned to their shared cell does not alter my finding that Miller became an agent with regard to Pannell. The Supreme Court has made clear that certain government conduct is tantamount to sponsorship of further investigation, even where the government explicitly instructs the informant to cease all questioning of the defendant. *See Henry*, 447 U.S. at 271. In *Henry*, the defendant in a bank robbery prosecution challenged the admission of his pre-trial cellmate's testimony on the grounds that the cellmate was a government agent. *Id*. at 265. Even though the informant was given specific instructions not to question Henry about his case,[9] the Court found the government had in fact "deliberately elicited" the information from Henry, stating, "[e]ven if the agent's statement that he did not intend that [the informant] would take affirmative steps to secure incriminating information is accepted, he must have known that such propinquity likely would lead to that result." *Id*. at 271. The Court noted that, although the informant had not questioned Henry, the informant had "stimulated" conversations with him in order to "elicit" incriminating information. *Id*. at 273. Those facts amounted to "'indirect and surreptitious interrogatio[n]'" of the defendant. *Id*. Consequently, the Court found that the government violated Henry's right to counsel by "intentionally creating a situation likely to induce Henry to make incriminating statements without the assistance of counsel." *Id*. at 274.

Here, the government was well aware that Miller would likely secure additional information

---

[9] The case agent submitted an affidavit stating the following: "I recall telling [the informant] not to initiate any conversations with Henry regarding the bank robbery charges against Henry, but that if Henry initiated the conversations with [the informant], I requested [the informant] to pay attention to the information furnished by Henry." *Id*. at 268.

9

from Pannell. Postal Inspector Minecci testified to as much during the *Massiah* hearing when he indicated that he anticipated receiving further Pannell statements from Miller after the first meeting. *See* Hearing Tr. 22, Aug. 30, 2007. Postal Inspector Minecci's anticipation was entirely reasonable: Miller was a known entrepreneurial prisoner who (1) had great incentive to secure additional information from Pannell, and (2) had represented to the government that he had already used his position as cellmate to earn Pannell's trust. Accordingly, the return of Miller to his and Pannell's cell created the very situation that the *Henry* Court denounced, one likely to induce Pannell to make incriminating statements without the assistance of his counsel.

Because Miller was a government agent after the first meeting, any information he *deliberately elicited* after March 6, 2007, the date of that meeting, is barred under *Massiah*. Where "an informant obtains some initial evidence, approaches the government to make a deal on the basis of that information, and then – with the backing of the government – deliberately elicits further evidence from an accused, the materials gotten after such government contact are properly excluded under the *Massiah* rule." *Stevens*, 83 F.3d at 64.

### B. Did Miller Engage in Deliberate Elicitation?

Because Miller was not a government agent until March 6, 2007, it is unnecessary to determine whether he engaged in deliberate elicitation before then. Accordingly, the remaining issue is whether Miller deliberately elicited the information he obtained after the first meeting. If he did, even by means less direct than affirmative interrogation, Pannell's Sixth Amendment rights were violated. *See Henry*, 447 U.S. at 272, n.8 (noting different means of elicitation: "[T]he agent only instructed [the informant] not to question Henry or to initiate conversations regarding the bank robbery charges. Under these instructions, [the informant] remained free to discharge his task of

10

eliciting the statements in myriad less direct ways.").

Despite the government's instruction to Miller not to speak with Pannell about his case at the conclusion of both the first and second meetings, and Miller's claim that he followed the instruction, the credible evidence offered at the hearing does not support a conclusion that Miller served as a mere "listening post." Miller testified that he never asked Pannell any questions about his case and that Pannell volunteered the information during lengthy conversations about general, everyday matters. Having carefully observed Miller, his testimony that Pannell volunteered detailed incriminating information – as memorialized in Miller's notes – without any prompting or encouragement from Miller cannot be credited. Miller had great incentive to actively encourage Pannell to incriminate himself: Miller understood that any additional information he secured could serve as a basis for a reduction of his very lengthy sentence. In addition, Miller was evasive and gave conclusory answers when questioned as to how Pannell had provided such painstakingly detailed information about his involvement in the post office robbery, repeatedly saying, "we conversated." *See* Hearing Tr. 57-59, 88. Indeed, Miller would not acknowledge that, in the course of their conversations, even on everyday matters, he had ever asked Pannell a single question. I therefore discredit Miller's testimony that he never asked Pannell any questions about his case nor encouraged him to speak of it.

Thus, I find that Miller acquired the information he later provided to the government through some form of active encouragement of Pannell. Far from being a mere "listening post," Miller participated "in active conversation" in a deliberate attempt to elicit incriminating remarks from Pannell. Accordingly, the information he procured after the first meeting runs afoul of *Massiah* and the Sixth Amendment. Those statements are therefore suppressed.

11

## CONCLUSION

For the reasons set forth above, Pannell's motion is granted to the extent that the statements procured by Miller after March 6, 2007 are suppressed, and denied to the extent that the statements procured by Miller before March 6, 2007 are not.

**SO ORDERED.**

**/s/**
**NINA GERSHON**
**United States District Judge**

Dated: Brooklyn, New York
September 20, 2007